**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, <br><br> *Plaintiff*, <br><br> v. <br><br> **DREW H. WRIGLEY,** in his official capacity as Attorney General of North Dakota, *et al.*, <br><br> *Defendants.* | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** <br><br> **No. 1:25-cv-00204-DMT-CRH** <br><br> **ORAL ARGUMENT REQUESTED** |

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ..................................9

I.    The Federal 340B Drug Pricing Program ..............................................9

    A.    Congress Creates A Comprehensive Law But Contract Pharmacies Barge In...........................................................................................9

    B.    Manufacturers Attempt To Curb Abuse ...................................12

        1.    Contract Pharmacy Policies ...........................................12

        2.    340B, The IRA, And Rebate Models............................16

    C.    The Supreme Court Concludes The Federal Enforcement Scheme Is Exclusive ..........................................................................17

II.    House Bill 1473 ...................................................................................18

LEGAL STANDARD........................................................................................19

ARGUMENT .....................................................................................................19

I.    H.B. 1473'S PLAIN TEXT DOES NOT RESTRICT PHRMA'S MEMBERS' OFFERS TO SELL 340B-PRICED DRUGS .................20

II.    UNDER DEFENDANTS' INTERPRETATION, H.B. 1473 IS PREEMPTED .......................................................................................22

    A.    North Dakota Cannot Add Additional Conditions To A Federal Program Enacted Via The Spending Power................................22

    B.    H.B. 1473 Is Also Field And Conflict Preempted Under Traditional Principles........................................................................26

        1.    Under Defendants' Interpretation, H.B. 1473 Intrudes On An Exclusively Federal Field.......................................27

        2.    Under Defendants' Interpretation, H.B. 1473 Conflicts With The Federal Regime ...........................................31

            a.    H.B. 1473 Would Conflict With Congress's Offer-and-Acceptance Mechanism And Impermissibly Expand The Scope Of The Federal 340B Subsidy ...........31

　　　　　b.　　H.B. 1473 Would Unlawfully Limit Access To
　　　　　　　　Claims Data.........................................................................34

　　　　　c.　　H.B. 1473 Would Impermissibly Seek To Outlaw
　　　　　　　　The Rebate Model..............................................................36

　　　　　d.　　H.B. 1473 Would Conflict With The Federal
　　　　　　　　Enforcement Regime ........................................................37

　　　C.　　*McClain* Does Not Control ....................................................39

III.　　UNDER DEFENDANTS' INTERPRETATION OF H.B. 1473, H.B. 1473
　　　VIOLATES THE CONSTITUTION'S BAR ON EXTRATERRITORIAL
　　　REGULATION................................................................................41

CONCLUSION.......................................................................................................45

## INTRODUCTION

This case concerns North Dakota's House Bill 1473 ("H.B. 1473"), which targets directly and exclusively drug manufacturers' obligations under a federal drug pricing program known as 340B. 42 U.S.C. § 256b ("340B"). Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") seeks a declaration that H.B. 1473 means what its plain text says, namely, that it does not regulate the conditions that manufacturers may require purchasers to accept in order to purchase drugs at reduced 340B prices. Such a declaration would avoid the constitutional infirmities under the U.S. Constitution's Supremacy Clause and prohibition on extraterritorial regulation that would result if Defendants' sweeping construction of H.B. 1473 were accepted.

H.B. 1473 targets a unique federal program that is a creature of Congress's Spending Power. "Through Medicare and Medicaid, [the federal government] pays for almost half the annual nationwide spending on prescription drugs." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023).[1] The federal government thus has extraordinary leverage to use the promise of federal funding under those programs to induce drug manufacturers to agree to obligations it could not impose on them directly. And Congress uses that market power to enlist manufacturers "to subsidize healthcare." *Id.* In particular, as a condition of reimbursement under Medicare Part B and the federal share of Medicaid, Congress requires manufacturers to sign a federal agreement to offer certain drugs at strikingly low prices—often pennies per unit—to fifteen enumerated types of healthcare providers ("covered entities"), which then resell those drugs to their patients at higher prices. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 455-58 (D.C. Cir. 2024). In this way, the federal government engages private businesses—drug manufacturers—to deliver 340B's unique federally mandated, privately funded subsidy.

---

[1] Unless otherwise noted, all internal citations are omitted.

That is not something Congress can simply mandate; instead, it uses its Spending Power to enlist manufacturers to agree to offer this reduced pricing to specific covered entities. In any other context, a law (federal or state) that simply compelled private parties to sell their property at confiscatory prices would raise serious constitutional concerns. But "Congress may 'regulate where it otherwise could not'—beyond its enumerated powers, in other words—by imposing conditions on federal funds," provided the recipients "consent to the bargain." *Ali v. Adamson*, 132 F.4th 924, 930-31 (6th Cir. 2025); *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983). And that is precisely what Congress has done by making participation in the 340B program one of the "condition[s] of participating in Medicare Part B and Medicaid," *Novartis*, 102 F.4th at 455, that "define the limits of th[os]e government spending program[s]," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). As a result, the obligations imposed on manufacturers via participation in 340B must be imposed "unambiguously" by Congress. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219-20 (2022) (recipient of federal funds must not only know "what rules it must follow" but "also what sort of penalties might be on the table"); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (question is whether the legislation "furnishes clear notice").

Critically, manufacturers' federal 340B obligations are limited: 340B-participating manufacturers must only "offer" drugs at the federal price and can include reasonable conditions on their offers concerning issues other than price, so long as their 340B offer remains "bona fide." *Novartis*, 102 F.4th at 460-64; 42 U.S.C. § 256b(a)(1). Those conditions lie at the heart of this case. Although pharmacies are not among the enumerated covered entities under 340B and covered entities are expressly barred from reselling or transferring 340B-priced drugs to persons other than their "patient[s]," *see* 42 U.S.C. § 256b(a)(5)(B), for-profit pharmacies, referred to as

"contract pharmacies," routinely team up with covered entities to seek access to 340B-priced drugs to make additional profit. These pharmacies enter into a contract with a covered entity, purportedly to receive 340B-priced drugs on its behalf and dispense them to its patients. But these pharmacies dispense 340B-priced drugs to all pharmacy customers, regardless of covered-entity patient status. The D.C. Circuit has now made clear that manufacturers may attach reasonable conditions to their federal 340B offers, including restrictions limiting the number of contract pharmacies to which manufacturers will provide 340B-priced drugs and requirements that covered entities submit claims data (data concerning the prescriptions for which a 340B discount is claimed). *Novartis*, 102 F.4th at 460-64. That "bona fide" offer framework, as explained in *Novartis*, establishes the scope of a manufacturer's obligation to "offer" 340B-priced drugs. *Id.*

More specifically, under federal law, manufacturers are explicitly permitted and therefore have the right to include reasonable conditions regarding contract pharmacies in their 340B bona fide offers, including a one contract pharmacy limitation and a claims data condition. *See id.* The 340B price applies only where a covered entity accepts the offer by assenting to a manufacturer's conditions; otherwise, there is no purchase to which the 340B price attaches and a manufacturer's 340B obligation has been nonetheless discharged. *See id.*

This case seeks to vindicate and protect manufacturers' right to include those conditions in their 340B offers in North Dakota. On April 4, 2025, North Dakota enacted H.B. 1473. H.B. 1473 is not a law of general applicability. It instead imposes a host of restrictions on manufacturers based solely on their participation in the federal 340B program and only with respect to drugs purchased under that federal program, including that manufacturers not "[d]irectly or indirectly … interfere with the acquisition of a drug by a contract pharmacy" or "[r]equire a covered entity or contract pharmacy to submit any claims" data. H.B. 1473 § 1(b)(1), (3). At the same time,

H.B. 1473's restrictions apply only to specific "drug[s]," defined as drugs "*purchased* under reduced pricing under section 340B." *Id.* § 1(a)(3) (emphasis added). As *Novartis* makes clear, when a manufacturer imposes a one contract pharmacy limitation or claims data requirement, that is a condition of its federal 340B offer—it happens upstream of any "purchase" and acceptance is required to complete the sale. 102 F.4th at 460-64. So, if a covered entity does not accept those conditions, there is no sale at the 340B price and therefore no "purchase" to which H.B. 1473's definition of "drug" and associated restrictions could apply.

H.B. 1473's plain text therefore respects the limited obligation on which manufacturers and the federal government agreed—that manufacturers "shall offer" drugs at specified reduced pricing, subject to other reasonable conditions. It does so by applying its restrictions only to drugs that were "*purchased* under reduced pricing under section 340B." H.B. 1473 § 1(a)(3) (emphasis added). That limitation ensures that H.B. 1473 does not expand the federal subsidy beyond the circumstances that Congress required and manufacturers agreed. By limiting the statute's reach to only drugs "purchased … under 340B," H.B. 1473 appears to allow manufacturers to continue to include reasonable conditions in their bona fide *offers*, including the specific conditions upheld as lawful in *Novartis*. As discussed, there is no "purchase … under section 340B" if such conditions are not accepted, and therefore H.B. 1473 would not apply.

However, while H.B. 1473's text recognizes Congress's limitations on 340B, Defendants do not. *See* Answer ¶ 157, ECF No. 2. Instead, Defendants seem to believe that H.B. 1473 imposes new obligations on manufacturers participating in 340B by mandating that manufacturers provide federal 340B price reductions in a range of circumstances where federal law and manufacturers' federal contracts under 340B do not require them to do so. Specifically, Defendants appear to interpret the statute to provide that PhRMA members *cannot* include

reasonable conditions on their offers concerning issues other than price, include the specific conditions discussed and upheld in *Novartis*.  Even worse, H.B. 1473, under Defendants' construction, purports to impose obligations that federal courts repeatedly held cannot be imposed by even the federal agency charged with overseeing the 340B program, the U.S. Department of Health and Human Services ("HHS").  Defendants' construction thus materially expands the program:  Without H.B. 1473, there would be no sale at the 340B price in circumstances that violate a contract pharmacy or claims data condition in a bona fide offer.  With H.B. 1473 (as Defendants construe it), a purchase at the 340B price must occur, since manufacturers cannot impose those federally lawful conditions.  And on Defendants' view of H.B. 1473, by expanding the scope of the federal program that HHS must oversee, H.B. 1473 saddles HHS with additional burdens Congress chose not to impose.

But under the Supremacy Clause of the U.S. Constitution, state law cannot supplant federal law in this way.  The federal government has a unique and heightened interest in the uniform and exclusive administration of its Spending Power programs and its federal contracts with manufacturers.  When states attempt to interfere with these types of federal programs, the so-called presumption against preemption does not apply.  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).  Instead, the opposite presumption applies:  States cannot modify, add to, or interfere with those federal agreements in a way that impairs a federal function because conditions on participation in Spending Power programs must be explicit at the outset and cannot be changed unless clearly and unambiguously authorized by Congress.  *See CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321-23 (3d Cir. 2025) (collecting cases on intergovernmental immunity).  North Dakota thus does not have the power to modify the 340B Spending Power program at all, let alone to inject new obligations altering the bargain manufacturers made when they signed the

federal 340B agreement or to saddle HHS with obligations that Congress chose not to authorize or impose. H.B. 1473 is preempted for that reason alone, if Defendants' view of its scope is correct.

The unique features of 340B demonstrate why H.B. 1473, as construed by Defendants, is also preempted under broader field and conflict preemption principles. Multiple provisions of the 340B statute confirm that Congress simply did not leave room for states to reset the balance it struck, and Defendants' interpretation of H.B. 1473 gives rise to multiple direct conflicts to boot.

First, in subsection (a)(1) of the 340B statute, Congress required only that manufacturers "offer" 340B drugs at reduced federal prices to covered entities, and those offers can include specific "reasonable" conditions, including those upheld in *Novartis*. 42 U.S.C. § 256b(a)(1); *Novartis*, 102 F.4th at 460-64. But, under Defendants' construction, North Dakota's H.B. 1473 would outlaw these federally permissible, reasonable conditions on federal 340B offers. *See infra* at 22-26, 29-31. In that way, Defendants' interpretation of H.B. 1473 seeks to compel 340B-priced sales that would not occur under federal law. *See Novartis*, 102 F.4th at 462-64. Again, this fundamentally alters the 340B program's bargain between manufacturers and the federal government.

Second, "claims data" is key data about the specific prescriptions that may or may not qualify for 340B pricing under federal law. Such data is "readily available" to healthcare providers, widely utilized in healthcare billing, and minimally burdensome to provide.[2] Claims data is also essential for manufacturers to invoke the federal statutory remedies process under the federal 340B program. *See infra* at 16-17, 34-36. And the D.C. Circuit has held expressly that

---

[2] Rebate Model Pilot Program, 90 Fed. Reg. 36,163, 36,165 (Aug. 1, 2025) (referring to claims data as "readily available"); *Novartis*, 102 F.4th at 463 (discussing that the "burden of providing the claims data is 'minimal'"); *Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 451 (S.D.W. Va. 2024) (noting that use of claims data is "widespread").

manufacturers can lawfully mandate the sharing of claims data as a precondition to providing 340B pricing on sales involving "contract pharmacies." *Novartis*, 102 F.4th at 462-64. Yet, under Defendants' interpretation of the statute, H.B. 1473 seeks to hide this critical data from manufacturers by prohibiting them from requiring it as a precondition for providing 340B pricing. H.B. 1473 § 1(b)(3). That not only frustrates the operation of remedial rights Congress expressly made available to manufacturers under 340B, but also expands the obligations of HHS. That agency will now have to police a far greater universe of transactions in North Dakota. And, to make matters worse, H.B. 1473 also appears to outlaw HHS's new Rebate Model Pilot Program, which utilizes claims data to help harmonize compliance with 340B and key elements of another federal statute, the Inflation Reduction Act ("IRA"). 90 Fed. Reg. at 36,163-65. H.B. 1473's bar on claims data collection thus also directly interferes with federal law. *See Morrisey*, 760 F. Supp. 3d at 450-53.

Third, Defendants' interpretation outlaws the use of what are known as "rebate models." *See infra* at 16-17, 36-37. And it does so despite the federal statute explicitly contemplating their use, and HHS's new Rebate Model Pilot Program that expressly permits certain manufacturers to provide the 340B price via rebates, rather than upfront discounts. 90 Fed. Reg. at 36,163-65.

Fourth, Defendants' interpretation of H.B. 1473 also conflicts with 340B's exclusive federal administration and enforcement regime. *See Morrisey*, 760 F. Supp. 3d at 453-61 (concluding that a similar state 340B law conflicts with the exclusive administration and enforcement regime established by Congress). As the Supreme Court made clear in *Astra USA, Inc. v. Santa Clara County*, Congress intended that 340B be administered exclusively by HHS, on a "uniform nationwide basis," with enforcement "centralized" in the federal government. 563 U.S. 110, 119-22 (2011). Congress created a series of unique and exclusive federal remedy provisions

governing 340B.  *Id.*; *see* 42 U.S.C. § 256b(d).  The Supreme Court warned specifically that splitting the enforcement burden among multiple decisionmakers would risk "conflicting adjudications," endangering the program.  *Astra*, 563 U.S. at 120.  But H.B. 1473, under Defendants' construction, empowers state decisionmakers to enforce North Dakota's requirements, addressing *the same conduct* already covered by the federal program's exclusive remedial measures.  *See, e.g.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("[C]onflict is imminent whenever two separate remedies are brought to bear on the same activity.") (cleaned up).  These state enforcement measures directly conflict with HHS's exclusive authority and present the precise risk of conflicting adjudications *Astra* identified.  563 U.S. at 119-22.  If held applicable to PhRMA members' federal 340B offers and not invalidated, H.B. 1473, along with similar laws in dozens of other states, will prevent HHS from managing the 340B program on a uniform nationwide basis—it will no longer be uniform or federal.

Defendants may argue that *Pharmaceutical Research & Manufacturers of America v. McClain*, 95 F.4th 1136 (8th Cir. 2024), governs this case.  But that contention cannot be squared with the arguments in this case and Defendants' construction of H.B. 1473.  *McClain* predated *Novartis* and did not address the very specific and irreconcilable conflicts with H.B. 1473 raised in this case, including (1) PhRMA members' federally permissible one contract pharmacy and claims data conditions on their "offers" under 42 U.S.C. § 256b(a)(1); and (2) HHS's recent Rebate Model Pilot Program.  Moreover, the *McClain* court made clear that a law that does mandate 340B pricing for sales that would not occur under federal law *would be* preempted.  *See infra* at 39-41.  Defendants' construction of H.B. 1473, if accepted, would do just that.

Nor did *McClain* address PhRMA's claim here that H.B. 1473, under Defendants' expansive interpretation, violates the Constitution's prohibition on extraterritorial regulation.

8

Almost all pertinent manufacturer transactions occur *extraterritorially*, outside North Dakota, between out-of-state manufacturers and out-of-state distributors, which in turn handle sales of drugs to covered entities and pharmacies (some of which are located in North Dakota).  As the Eighth Circuit recently held, *Association for Accessible Medicines v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025), *reh'g denied,* No. 24-1019, 2025 WL 2178535 (8th Cir. Aug. 1, 2025), laws that directly regulate out-of-state transactions are unconstitutional.  H.B. 1473 is just such a law:  As construed by Defendants, H.B. 1473 regulates wholly out-of-state transactions between out-of-state manufacturers, on the one hand, and out-of-state distributors, on the other.  *See infra* at 41-45.  That is impermissible, as *Accessible Medicines* held in indistinguishable circumstances.

The Court should enter summary judgment in PhRMA's favor, making clear that H.B. 1473 does not and cannot regulate PhRMA members' federally authorized conditions on 340B offers.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.   THE FEDERAL 340B DRUG PRICING PROGRAM

#### A.  Congress Creates A Comprehensive Law But Contract Pharmacies Barge In

To receive federal Medicaid or Medicare Part B reimbursements, manufacturers must sign the federal 340B agreement and opt into that program.  42 U.S.C. §§ 256b(a)(1),1396r-8(a)(1).  The federal statute and federal agreement require that the manufacturer "shall offer" 340B-reduced-price drugs to a statutory list of 15 types of healthcare providers ("covered entities")*.  Id*. §§ 256b(a)(1), (4).  That is not something Congress or an agency (or a state) can simply mandate without a manufacturer's opt-in without raising serious constitutional concerns.  *See, e.g.*, U.S. Const. amends. V, XIV.  And because manufacturer participation in Medicare, Medicaid, and 340B rise and fall together, Congress needed to ensure that the benefits of participation in Medicare and Medicaid outweigh the burdens of 340B participation.  That is why, among other things, Congress narrowly circumscribed the entities eligible for reduced prices.  As relevant here, no

pharmacies of any kind appear on that statutory list of covered entities.  42 U.S.C. § 256b(a)(4).

Congress also tried to prevent the inevitable temptation for abuse of the limited subsidy. To that end, in 42 U.S.C. § 256b(a)(5), Congress prohibited a covered entity from requesting a "duplicate discount[]" by seeking a rebate under Medicaid for a 340B-priced drug (known as the "duplicate discount" provision), or from reselling or transferring a 340B-priced drug to any person other than a "patient" of that entity (known as the "diversion" provision).  In 1996, HHS addressed whether a covered entity *without* an in-house pharmacy could contract with one—but only one— outside pharmacy to dispense 340B-priced drugs to its patients.  The agency reasoned that, if such a pharmacy was contractually an "agent" of the covered entity (a "contract pharmacy"), and the covered entity retained title to the drugs at all times before they were dispensed to its patients, then such an arrangement would not violate the diversion provision.  61 Fed. Reg. 43,549, 43,550, 43,555 (Aug. 23, 1996).  Concerned about the risk of diversion, however, HHS permitted each covered entity to have a maximum of *one* contract pharmacy.  *Id.* 43,555.

These requirements applied for 14 years, until HHS "swerved" and changed its guidance, allowing an *unlimited* number of contract pharmacies for each covered entity.  *Novartis*, 102 F.4th at 457-58 (explaining this history and problems that developed).  Thereafter, the number of contract pharmacies exploded, as (predictably) did the number of claims for 340B pricing— meaning the cost to manufacturers skyrocketed, even though the patient population of covered entities eligible for 340B pricing did not expand at anything approaching the same rate.  *Id.*  By 2023, the number of contract pharmacy arrangements had risen to 33,000 compared to 1,300 in 2010.  GAO, GAO-18-480 at 10 (2018), Ex. 4; S. Comm. on Health, Educ., Lab., & Pensions, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* 3 (Apr. 2025), Ex. 5  As the Government Accountability Office ("GAO") and the HHS Inspector General ("OIG")

have explained, many for-profit pharmacies—including the nation's largest chains—recognized that if they could insert themselves into 340B, they could acquire drugs at 340B prices, sell them at or near full price, and pocket a portion as profit. *Novartis*, 102 F.4th at 456-58.[3]

This explosion ballooned 340B's size and dramatically increased the risk of abuse. In a GAO study, contract pharmacies accounted for nearly two-thirds of unlawful diversion violations. Ex. 4 at 44-45 ("The expansion of contract pharmacies … increases potential … risks related to diversion and duplicate discounts."); GAO, GAO-20-108 at 5 (2019), Ex. 26; GAO, GAO-11-836 at 28 (2011), Ex. 28; GAO, GAO-20-212 (2020), Ex. 29. Overall, "growth in the use of contract pharmacies has amplified the complexity of 340B Program oversight, particularly regarding patient eligibility, drug diversion, and duplicate discounts." Ex. 5 at 3.

The opportunity for abuse is even more acute given most contract pharmacies' use of the product "replenishment model." *Id.* at 31. Although HHS directed that covered entities should retain title to 340B-priced drugs and require contract pharmacies to operate as their agents, 61 Fed. Reg. at 43,550, 43,553, the product replenishment model jettisons these limitations.[4] Using this model, contract pharmacies dispense drugs from their general inventories to all customers. *Examining Oversight Reports on the 340B Drug Pricing Program*, 115th Cong. 11-12 (2018), Ex. 8. On the back end, contract pharmacies use undisclosed algorithms to purport to retroactively identify customers that may have some relationship to a covered entity and restock their general inventories with 340B-priced drugs based on the outcome. *Id.* at 11; Ex. 4 at 2; *Novartis* at 457-58; Pedley Decl. at ¶¶ 5-11, Ex. 22. This black-box system creates more opportunities for

---

[3] CVS and Walgreens have publicly disclosed that 340B revenue is material to their finances. CVS, SEC Form 10-K 23 (2024), Ex. 6; Walgreens, SEC Form 10-K 30 (2024), Ex. 7.

[4] *See, e.g.*, Walgreens 340B Contract §§ 3.3.5, 8.10, Ex. 23; Dallas County 340B Agreement at 5, Ex. 24; Monterey and CVS Pharmacy, Inc. Agreement at 9, Ex. 25.

diversion.  Ex. 8 at 11-12; HHS, *Mem. Report: Contract Pharmacy Arrangements in the 340B Program* 16 (2014), Ex. 21.  It also results in greater profits, incentivizing "catalog[ing] as many prescriptions as possible as eligible for the discount."  *Novartis*, 102 F.4th at 457-58.  With the list price value of 340B purchases reaching $147.8 billion in 2024, 340B is now the second largest federal government pharmaceutical program.  Adam Fein, Drug Channels News Roundup (June 24, 2025), Ex. 9; Rory Martin & Harish Karne, The Size & Growth of the 340B Program in 2024 1, Ex. 10; GAO, GAO-23-106095 at 16-17 (2023), Ex. 27.

Unfortunately, these price reductions usually are not passed on to patients because drugs come out of a pharmacy's general inventory and 340B pricing is not applied until after patients depart.  *Morrisey*, 760 F. Supp. 3d at 447; Rory Martin & Kepler Illich, Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies? 3, 12, Ex. 11.

## B. Manufacturers Attempt To Curb Abuse

### 1. Contract Pharmacy Policies

Eventually, drug manufacturers (including PhRMA members) concerned with diversion and illegal duplicate discounts associated with contract pharmacies individually implemented their own policies meant to identify and address these problems.  *Novartis*, 102 F.4th at 457-58.  Here is how those policies generally work:  Drugs—including 340B-priced drugs—follow a multistep path from manufacturer to patient.   PhRMA's members sell their drugs—including drugs ultimately sold at 340B prices—to distributors.  Stansel Decl. ¶ 8-10, Ex. 1; O'Harra Decl. ¶ 17-29, Ex. 2; Janco Decl. ¶ 8-14, Ex. 3.  The vast majority of these sales are to three major distributors: Cardinal Health, Cencora, and McKesson.  Ex. 2 ¶10.  PhRMA's members and the major distributors are all headquartered and incorporated outside North Dakota, and PhRMA's members ship their drugs to major distributor warehouses located outside North Dakota.  Ex. 1 ¶¶ 3-10; Exs. 34-37.  Pharmacies and healthcare providers purchase PhRMA's members' drugs from the major

distributors, which ship these drugs nationwide. Ex. 1 ¶ 10; Ex. 2 ¶¶ 10-11; Ex. 3 ¶¶ 15-16. According to federal statistics, almost half of contract pharmacies serving North Dakota-based covered entities are outside North Dakota, many located far from North Dakota in states including California, New Jersey, and Alabama, among others.[5]

PhRMA's members' one contract pharmacy and claims data conditions are implemented in the following way:  When a member manufacturer includes these permissible conditions on its offer of 340B-priced drugs, a drug distributor will configure these conditions into the programming logic of the distributor's platform that covered entities and their contract pharmacies use to purchase the manufacturer's drugs through the 340B program. Ex. 1 ¶¶ 10, 14-17; Ex. 2 ¶ 22-28; Ex. 3 ¶¶ 12-14.  This programming logic also blocks contract pharmacies that are ineligible (because the relevant covered entity has not accepted a manufacturer's 340B conditions) from purchasing 340B-priced drugs. Ex. 2 ¶¶ 25-28.  If a covered entity designates a contract pharmacy consistent with the manufacturer's 340B contract pharmacy policy and accedes to the terms of the manufacturer's conditions, the manufacturer includes the designated contract pharmacy on the list of eligible contract pharmacies that it provides to distributors. *Id.* ¶ 25.  The distributors then configure their systems to allow contract pharmacies on the manufacturer's list to access 340B pricing and block those not on the list from purchasing the drug at the 340B price. *Id.*

Accordingly, if a covered entity does not accept the reasonable conditions of a PhRMA member's contract pharmacy policy, it (or its contract pharmacy) cannot purchase drugs through the 340B program. *Id.* ¶¶ 22-28; Ex. 3 ¶¶ 12-14.  However, a covered entity that does not accept a manufacturer's contract pharmacy conditions, and any affiliated contract pharmacies, can still

---

[5] *See* U.S. Health Resources and Services Administration, 340B OPAIS Database, https://340bopais.hrsa.gov/SearchCp.

purchase drugs from the manufacturer outside of the 340B program at a commercial price for shipment to pharmacies, so long as the pharmacies qualify under relevant laws and requirements to receive the drugs.  Ex. 2 ¶¶ 24, 29; Ex. 3 ¶¶ 9, 14.

The same is true of PhRMA's members' claims data restrictions.  Ex. 1 ¶ 14; Ex. 2 ¶¶ 26-28; Ex. 3 ¶¶ 12-14.  A covered entity must accept a manufacturer's offer with a reasonable claims data condition to purchase 340B drugs.  *Id.*  If a covered entity does not agree, the manufacturer will not include the covered entity's contract pharmacies on the list of 340B-eligible customers sent to distributors.  Ex. 2 ¶¶ 26-28.  The distributor then blocks the covered entity's contract pharmacies from purchasing the manufacturer's drugs at 340B prices.  *Id.*

The permissibility of these very conditions has already been litigated.  In 2021, HHS issued a series of violation notices to drug manufacturers, including some PhRMA members, seeking to compel them to offer and deliver 340B-priced drugs to *all* covered-entity contract pharmacies.[6] Litigation followed, with key decisions in the U.S. Courts of Appeals for the Third and D.C. Circuits.  The central legal question in each of these cases was whether the federal government could mandate an "unlimited" contract pharmacy delivery requirement.  Both Circuits said "no."

In *Sanofi*, the Third Circuit explained that Congress contemplated "one-to-one" relationships between manufacturers and covered entities in the 340B program, "without mixing in a plethora of pharmacies."  58 F.4th at 704-05.  No language in the federal statute expressly addressed delivery to contract pharmacies—it is silent on that topic—and an unlimited contract pharmacy mandate could not be justified based on statutory text or structure.  *Id.* at 703-06.  But *Sanofi* recognized that a *federal* contract pharmacy delivery mandate might be appropriate on a

---

[6] HHS Letter to AstraZeneca, Ex. 12; HHS Letter to Lilly, Ex. 13; HHS Letter to Novartis, Ex. 14; HHS Letter to Novo Nordisk, Ex. 15; HHS Letter to Sanofi, Ex. 16.

smaller scale—for example, when a covered entity did not have any in-house pharmacy and thus could not "accept" a drug manufacturer's 340B offer without having *one* contract pharmacy to dispense the drugs. *Id.* 340B thus does not leave the issue of contract pharmacy policies unregulated; rather, it carefully calibrates when delivery to a contract pharmacy might be required to ensure a 340B offer remains bona fide. Accordingly, *Sanofi* explains how "delivery" to a contract pharmacy falls within the realm of HHS's authority (and outside of regulation by a state).

In *Novartis*, the D.C. Circuit went a step further. It first agreed with *Sanofi* that the 340B statutory text could not support HHS's *unlimited* contract pharmacy mandate. 102 F.4th at 460-64. Again, Congress had not identified contract pharmacies or delivery to those pharmacies in the statute. But HHS also specifically asked the court to answer a separate question under 42 U.S.C. § 256b(a)(1): Could the manufacturers lawfully condition their federal offers on a "one contract pharmacy" delivery limitation and a "claims data" condition? *Novartis*, 102 F.4th at 460-64.

*Novartis* clarified the law by answering that question in Sections 4 and 5 of its opinion. *Id.* at 463-64. Congress left manufacturers a degree of discretion to structure their 340B offers under 42 U.S.C. § 256b(a)(1), but such offers must still be "bona fide" and consistent with the federal statute. *Id.* at 462-64 (describing manufacturers' ability to put certain reasonable conditions on their federal 340B offers). The court then held that the two conditions at issue—a "one contract pharmacy" limitation and a requirement to provide "claims data"—met that test. *Id.* at 460-64. In other words, the manufacturer could offer to sell at 340B prices and deliver only to the covered entity or one contract pharmacy of the entity's choice. *Id.* As the court explained, the agency itself had enforced a one contract pharmacy limit for more than a decade. *Id.* at 461. Likewise, a manufacturer may reasonably condition its offer to sell at 340B prices on the covered entity providing "claims data"—information about the prescriptions at issue. *Id.* at 463. Claims data not

15

only is readily accessible from pharmacies and can be provided with minimal burden but is also key to the operation of the federal enforcement regime. *See infra* at 16-17.

A bona fide offer with these reasonable conditions satisfies a drug manufacturer's duty to make an offer under subsection (a)(1) of the federal statute and its federal agreement. Once such an offer is made, the manufacturer's "shall offer" obligations are discharged. *Novartis*, 102 F.4th at 460-64. If such an offer is not accepted by a covered entity, there is no sale of a 340B-priced drug. *See id.*; Ex. 2 ¶¶ 22-28; Ex. 3 ¶ 14. Accordingly, no "purchase[] … under section 340B" occurs. H.B. 1473 § 1(a)(3).

    2.  <u>340B, The IRA, And Rebate Models</u>

Recently, HHS also launched a Rebate Model Pilot Program, permitting specific conditions on 340B offers—including claims data requirements and 340B price reductions through after-purchase rebates, rather than pre-purchase discounts—by certain manufacturers to assist in implementing the IRA. *See* 90 Fed. Reg. at 36,163-65. The IRA establishes the Medicare Drug Price Negotiation Program, under which HHS is to "negotiate" with manufacturers "maximum fair prices" for certain drugs. 42 U.S.C. § 1320f-3(a). Manufacturers must provide access to selected drugs at the so-called maximum fair prices, except that they need not provide access to the maximum fair prices when such selected drugs are 340B-eligible and the 340B price is lower than the maximum fair price. *Id.* § 1320f-2(d). That is, manufacturers need not provide both the 340B price and "maximum fair price" on the same selected drug. *Id.* To avoid duplicate discounting, this scheme necessarily requires identifying when a drug subject to the maximum fair price is dispensed as a 340B drug.

The Centers for Medicare and Medicaid Services ("CMS") has issued final IRA guidance for avoiding duplicate discounting under the Medicare Drug Price Negotiation Program. Under that guidance, a manufacturer bears the burden of determining and verifying whether a "claim for

the selected drug is a 340B-eligible claim." CMS, Medicare Drug Pricing Negotiation Final Guidance 60, Ex. 17; *see also* CMS, Medicare Drug Price Negotiation Program Draft Guidance 48 (A manufacturer must "indicate[] that the claim for [a] selected drug is a 340B-eligible claim and the 340B ceiling price is lower than the [maximum fair price] for the selected drug."), Ex. 18.

On August 1, 2025, HHS issued guidance discussing one mechanism for qualifying drug manufacturers to provide the 340B ceiling price:  So-called "rebate models," which involve collecting claims data and then using retroactive rebates, rather than upfront discounting, to supply the 340B price. *See* 90 Fed. Reg. at 36,163-65. As the notice explains, manufacturers, including some PhRMA members, have sought to use rebate models, including claims data collection as part of the models, to detect and prevent duplicate discounts (including duplicate discounts under the IRA) and diversion. *Id.* The announcement explains HHS's view that it has authority over and regulates terms of 340B participation, including the ability to use such rebate models. *Id.* at 36,163-65. In addition to expressly permitting the use of rebates for qualifying manufacturers, the announcement also makes clear that participating manufacturers can demand certain claims data as part of their rebate models to guard against duplicate discounting. *Id.* at 36,164.[7]

## C.  The Supreme Court Concludes The Federal Enforcement Scheme Is Exclusive

The administration of 340B and 340B's enforcement lie solely in the federal government's hands—unlike some federal healthcare programs, 340B is not an exercise in so-called "cooperative federalism." The Supreme Court has—unanimously—made this clear. *Astra*, 563 U.S. at 119-21. Congress amended the 340B statute in 2010 during the pendency of litigation between manufacturers and covered entities. *Id.* at 116-17. In its amendments, Congress created a new

---

[7] Multiple PhRMA members are eligible to participate in HHS's new Rebate Model Pilot Program. HHS, 340B Rebate Model Pilot Program FAQ, Ex. 20; Johnson & Johnson Reply Br. at 2-3, *Novartis Pharms. Corp., et al. v. Kennedy*, No. 25-5236 (D.C. Cir. Aug. 29, 2025), Doc. 2132722 ("J&J looks forward to participating in the pilot[.]").

comprehensive and exclusive remedies process, *see* 42 U.S.C. § 256b(d), with several unique features.  The process is required to be iterative, with informal dispute resolution, corrective actions, audits, adjustments, and refunds all preceding any assessment of civil penalties.  *Id.* § 256b(d)(1)(B)(v)-(vi); *Astra*, 563 U.S. at 121-22.  Issues related to 340B compliance and obligations raised by covered entities or manufacturers are to be resolved through Administrative Dispute Resolution ("ADR").  42 U.S.C. § 256b(d)(3)(A).  HHS decisions on these issues are final, subject only to federal court review.  *Id.* § 256b(d)(3)(C).

HHS has described these federal processes as *the exclusive remedies for any disputes regarding contract pharmacies* and has sought to structure its regulations to address them.  Gov. Reply Br. at 5, *Am. Hosp. Ass'n v. HHS*, No. 4:20-cv-08806 (N.D. Cal. Feb. 1, 2021), ECF No. 82 ("*AHA* Gov. Reply Br.").  Indeed, covered entities have brought multiple ADR claims about contract pharmacies and manufacturers' one contract pharmacy policies before HHS.  *See* HHS ADR Panel, *St. Croix Reg'l Med. Ctr.* Decision Summary (2025) (holding manufacturers' contract pharmacy policies are not violations of 340B), Ex. 19; Open Door ADR Petition at ¶ 1, Ex. 30; Univ. of Washington ADR Petition at ¶¶ 35-37, Ex. 31.

## II.    HOUSE BILL 1473

H.B. 1473 was signed into law on April 4, 2025, and went into effect on August 1, 2025.  N.D.C.C. § 1-02-42.  H.B. 1473 provides that its restrictions apply only to a "drug," defined as a drug that is "purchased *under reduced pricing under section 340B* of the federal Public Health Service Act [42 U.S.C. 201 et seq.] by a covered entity."  H.B. 1473 § 1(a)(3) (emphasis added).

Once a 340B-priced drug is purchased by a covered entity, H.B. 1473 instructs that a manufacturer may not, "[d]irectly or indirectly, deny, restrict, prohibit or otherwise interfere with the acquisition of a drug by a contract pharmacy on behalf of a covered entity unless receipt of the drug is prohibited by federal law."  *Id.* § 1(b)(1).  It also provides that a manufacturer may not

"[p]rohibit a contract pharmacy from dispensing a drug by denying access to the drug," "[i]nterfere with the ability of a covered entity or contract pharmacy to dispense a drug to an eligible patient of the covered entity," or "[o]ffer or otherwise make available a drug in the form of a rebate, unless in the form of a discount at the time of sale and authorized under federal law." *Id.* § 1(b)(2), (4), (5). Finally, H.B. 1473 bars manufacturers from requesting claims data for 340B-priced drugs, by specifying that a manufacturer may not "[r]equire a covered entity or contract pharmacy to submit any claims, encounter, or utilization data as a condition for acquiring or receiving a drug, unless the claims, encounter, or utilization data sharing is required by federal law." *Id.* § 1(b)(3).

H.B. 1473 also provides extensive penalties. It makes a violation of its substantive provisions a class B misdemeanor. *Id.* § 1(b). The North Dakota Board of Pharmacy can also impose civil penalties and seek injunctive relief. *Id.* § 1; N.D.C.C. § 43-15.3-09(1), (2).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides a court "shall … grant summary judgment if [the movant shows that] there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Mumford v. Godfried*, 52 F.3d 756, 759 (8th Cir. 1995).

## ARGUMENT

PhRMA brought this lawsuit because H.B. 1473, by its plain terms, should not apply to the 340B offers made by PhRMA's members and the reasonable conditions included in them. Under federal law, manufacturers are not required to sell—and do not sell—drugs at federal 340B prices when prospective purchasers do not accept conditions permitted under federal law governing those sales. A declaration stating as much would obviate the need to resolve the constitutional questions

that follow.  But if Defendants' interpretation of H.B. 1473 is correct, that statute would be invalid

under the U.S. Constitution's Supremacy and Commerce Clauses.

## I.    H.B. 1473'S PLAIN TEXT DOES NOT RESTRICT PHRMA'S MEMBERS' OFFERS TO SELL 340B-PRICED DRUGS

PhRMA principally seeks a declaratory judgment that H.B. 1473 does not restrict

PhRMA's members' conduct as described herein, namely, the imposition of federally permissible

conditions, including one contract pharmacy and claims data conditions, in their 340B offers.

Under North Dakota's statutory construction principles applicable here, H.B. 1473's plain

text governs.  *See Roubideaux v. N.D. Dep't of Corr. & Rehab.*, 570 F.3d 966, 972 (8th Cir. 2009)

("We are bound by North Dakota's rules of statutory interpretation in reviewing a North Dakota

statute.").  North Dakota courts afford words in a statute their plain, ordinary, and commonly

understood meaning.  *New Pub. Sch. Dist. #8 v. State Bd. of Pub. Sch. Educ.*, 2016 ND 163, ¶ 11,

883 N.W.2d 460; *see also In re Erickson P'ship*, 856 F.2d 1068, 1070 (8th Cir. 1988) (stating that

when the "terms of a statute [are] unambiguous, judicial inquiry is complete").  Moreover, under

North Dakota law, a statute is to be construed to avoid constitutional concerns unless the

construction giving rise to the constitutional concerns is the *sole* reasonable construction:  If a

statute "is susceptible of two constructions, one which will be compatible with constitutional

provisions or one which will render the statute unconstitutional, [the court] must adopt the

construction which will make the statute valid."  *In re S.B.*, 2014 ND 87, ¶ 17, 845 N.W.2d 317.

Under H.B. 1473's plain text, H.B. 1473's restrictions do not apply to PhRMA's members'

contract pharmacy policies.  Ex. 1 ¶¶ 13-16; Ex. 2 ¶¶ 25-26; Ex. 3 ¶¶ 12-14.  Each of H.B. 1473's

substantive restrictions apply only to a "drug," as defined in that statute.  *See, e.g.*, H.B. 1473

§ 1(b)(1) (prohibiting manufacturers from "[d]irectly or indirectly, deny[ing], restrict[ing],

prohibit[ing], or otherwise interfer[ing] with the acquisition of a *drug* by a contract pharmacy on

behalf of a covered entity unless receipt of the drug is prohibited by federal law.") (emphasis added).  In turn, H.B. 1473 explicitly defines a "drug" to mean "a drug *purchased under* reduced pricing under section 340B of the federal Public Health Service Act … by a covered entity."  *Id.* § 1(a)(3) (emphasis added).  The statute, by its own terms, thus applies only where a drug has *been purchased* through 340B, *i.e.* at the 340B price, meaning it purports to regulate activities post-purchase rather than how manufacturers may structure their pre-purchase 340B offers.

Consequently, H.B. 1473 does not govern PhRMA's members' reasonable conditions such as one contract pharmacy and claims data requirements included in the offer for 340B-priced drugs.  As *Novartis* explained, manufacturers' 340B obligation extends only to making an "offer" to sell at the 340B price, and may lawfully contain one contract pharmacy and claims data conditions.  When a covered entity does not accept those lawful conditions, there is therefore no "purchase under reduced pricing under section 340B."  *Id.* § 1(a)(3).

Defendants cannot argue that the Legislature's selection of this specific, unambiguous language was mere happenstance.  Title 19 of the North Dakota Century Code, in which H.B. 1473 is housed, defines "drug" for other purposes of the chapter in much broader terms, and does not limit its reach to drugs purchased under Section 340B.  *See* N.D.C.C. § 19-02.1-01(8).  The Legislature specifically chose not to have that broader definition apply here.

There is good reason for the Legislature's chosen limitation.  The Eighth Circuit has already recognized that a state law *would be* preempted where it required manufacturers to provide reduced 340B pricing in circumstances where federal law did not require the reduced-priced sale. *See McClain*, 95 F.4th at 1145.  And, as another court has held, laws that interfere with 340B's operation are conflict preempted.  *Morrisey*, 760 F. Supp. 3d at 450-61.  The Legislature's chosen limitation on a covered "drug" under H.B. 1473 thus ensures that 340B pricing is not expanded

beyond the limited set of transactions that Congress specified and to which manufacturers agreed.

H.B. 1473's unambiguous text is sufficient to resolve this case. This Court should declare that H.B. 1473 does not apply to PhRMA's members' conduct as described herein, *i.e.*, the imposition of federally permissible conditions, namely one contract pharmacy and claims data conditions, in their 340B offers. Ex. 1 ¶¶ 13-16; Ex. 2 ¶¶ 25-26; Ex. 3 ¶¶ 12-14. If there were any ambiguity (there is not), a construction requiring a drug to be "purchased under reduced pricing under section 340B," H.B. 1473, § 1(a)(3), also avoids the constitutional concerns that Defendants' construction creates. If H.B. 1473 were not limited to apply to drugs *already* purchased under 340B pricing, then H.B. 1473 would operate directly on the terms of manufacturers' federal 340B offers and, in doing so, alter the terms of manufacturers' participation in the federal 340B Spending Power program by forcing additional transactions at the federal, reduced 340B price. Such an action would be preempted multiple times over, *infra* at 26-41, and would violate the Constitution's prohibition on extraterritorial regulation, *infra* at 41-45. The North Dakota Legislature's alternative course—reflected in H.B. 1473's plain text—should be respected.

## II.   UNDER DEFENDANTS' INTERPRETATION, H.B. 1473 IS PREEMPTED

As discussed, H.B. 1473's explicit textual limitation on its reach ameliorates, for practical purposes, the preemption problems that H.B. 1473 would otherwise create. But if Defendants' broader interpretation of the statute were adopted—to require manufacturers to complete sales at the federal 340B price in circumstances that federal law does not require—it would be preempted.

### A.   North Dakota Cannot Add Additional Conditions To A Federal Program Enacted Via The Spending Power

Although the 340B program is complex, the basic defect with Defendants' interpretation of North Dakota's law is simple: States cannot modify, add to, or interfere with a federal program,

particularly one enacted pursuant to Congress's Spending Power. In such instances, the conditions on participation must be explicit at the outset, unless Congress unambiguously authorizes states to make such changes. Congress has not granted states any such authority here.

When Congress regulates via the Spending Power, recipients must "consent to the bargain." *Ali*, 132 F.4th at 930-31. That requires the terms of the agreement, including the obligations imposed, be unambiguous and set by Congress at the outset. *Cummings*, 596 U.S. at 219-20 (recipient of federal funds must not only know "what rules it must follow" but "also what sort of penalties might be on the table"); *Arlington*, 548 U.S. at 296 (question is whether the legislation "furnishes clear notice"). That is just the case here—Congress was required to obtain manufacturers' consent for participation in 340B, so any obligations for participation needed to be clear at the outset and imposed by Congress itself.

The resulting exclusively federal relationship raises unique preemption concerns. The Supreme Court has long and consistently rejected state efforts to regulate a program or relationship that "originates from, is governed by, and terminates according to federal law." *Buckman*, 531 U.S. at 347; *see also Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-13 (1988) (holding that state tort law cannot be used to hold federal contractors liable for design defects in contracted-for military equipment). That describes the 340B program to a T: It is created entirely by federal statute, *see* Pub. L. No. 102-585, § 602, 106 Stat. 4,943, 4,967 (1992); Pub. L. No. 111-148, §§ 7101-02, 124 Stat. 119, 821-27 (2010); it is governed only by federal law and administered exclusively by HHS, *see Astra*, 563 U.S. at 119-20; and federal law exclusively dictates who must participate in the program and when, *see* 42 U.S.C. §§ 1396r-8(a)(1), 256b(a)(1).

To be sure, states may require private parties that participate in federal programs to continue to comply with generally applicable state laws (at least so long as they do not conflict

with parties' federal-law obligations or are otherwise preempted). But states do not traditionally have the power to directly regulate the federal program or relationship itself. *See, e.g.*, *Buckman*, 531 U.S. at 348 (holding state-law claims for fraud on a federal agency preempted). For that reason alone, "no presumption against pre-emption obtains in this" context. *Id.* at 347. Quite the opposite: In cases like this one where a state has directly targeted a federal Spending Power program, "conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption," because the uniquely federal interest in "obligations to and rights of the United States" "changes what would otherwise be a conflict that cannot produce pre-emption into one that can." *Boyle*, 487 U.S. at 504, 508. Thus, courts are "more vigilant in striking down state incursions into subjects that Congress may have reserved to itself." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 73-74 (1st Cir. 1999), *aff'd, Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). Simply put, states cannot simply inject new requirements for private entities' participation in a federal Spending Power program. *See Cummings*, 596 U.S. at 219-20.

This time-tested approach to evaluating state laws that directly target federal programs makes sense, given that states lack authority in our constitutional system to single out for special regulation "the United States or those with whom it deals." *South Carolina v. Baker*, 485 U.S. 505, 523 (1988). Consistent with that principle, the Supreme Court has held time and again that states may not "control" federal operations by regulating those that contract with the federal government to advance federal objectives. *See Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738, 786-89, 866-67 (1824); *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 44-45 (1867); *Okla. Tax Comm'n v. Tex. Co.*, 336 U.S. 342, 364 (1949). Such discrimination occurs where a state law "singles" out those contracted with the federal government "for less favorable treatment" or "regulates them unfavorably on some basis related to their governmental status." *United States v.*

*Washington*, 596 U.S. 832, 839 (2022). Yet that is exactly what H.B. 1473 does under Defendants' interpretation. Under established principles of intergovernmental immunity, a state cannot directly regulate the activities of the federal government, nor impose obligations specific to those contracted with the federal government, unless Congress "clearly and unambiguously authorized it." *CoreCivic*, 145 F.4th at 321. And here, no one could seriously argue that Congress has "clearly and unambiguously authorized" states to add on their own requirements to the 340B program.

These bedrock principles suffice to resolve this case. With H.B. 1473, North Dakota seeks to barge into the federal 340B program and federal 340B contract, impose significant new obligations on drug manufacturers that change the federal bargain, and impose substantial additional burdens on HHS to boot. Specifically, subsections (1)-(5) of section 1(b) impose significant obligations not found in the 340B federal statute or the federal agreements. Those provisions explicitly provide that manufacturers' 340B offers violate state law if they "[d]irectly or indirectly deny, restrict, prohibit, or otherwise interfere with the acquisition of a drug by a contract pharmacy on behalf of a covered entity" or "[i]nterfere with the ability of a covered entity or contract pharmacy to dispense a drug to an eligible patient of the covered entity," or require "any claims, encounter, or utilization data" as a precondition to providing 340B pricing. H.B. 1473. § 1(b)(1), (3), and (4). Defendants' interpretation of the statute provides new state-law obligations that are directly at odds with the federal program that Congress established, which permits exactly the kind of contract pharmacy and claims data conditions that North Dakota allegedly forbids. *Compare id.*, *with Novartis*, 102 F.4th at 460-64 (concluding that one contract pharmacy policies and claims data conditions were reasonable conditions on federal offers). Indeed, these state provisions purport to prohibit HHS's current "Rebate Model Pilot Program" utilizing rebates and claims data preconditions. *See* 90 Fed. Reg. at 36,163-65.

Defendants' atextual interpretation of H.B. 1473 results in an unlawful effort to regulate, and impose new conditions on, Congress's 340B Spending Power program. On Defendants' view, H.B. 1473 injects new conditions into manufacturers' contracts with the federal government, making them assume obligations Congress did not require solely because they participate in a federal Spending Power program. And by simultaneously adding more contract pharmacies to 340B through which diversion and duplicate discounting may occur, their interpretation saddles HHS with policing obligations over many more transactions than Congress contemplated. North Dakota cannot single out those contracted with the federal government for special obligations that do not apply to those who do not participate in federal programs, let alone impose obligations on federal agencies. Defendants' interpretation of H.B. 1473 is invalid for that reason alone.

## B.  H.B. 1473 Is Also Field And Conflict Preempted Under Traditional Principles

Under Defendants' interpretation, H.B. 1473 is also preempted under traditional field and conflict preemption principles. "State law must … give way to federal law in at least two … circumstances." *Arizona v. United States*, 567 U.S. 387, 399 (2012). "[T]he States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* Congress's intent to preclude state regulation in an area can be "implicitly contained in [a federal statute's] structure and purpose," *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977), and often arises when there is a "dominant" federal interest or a "pervasive" "framework of [federal] regulation," *Arizona*, 567 U.S. at 399.

And states, of course, can never regulate in a manner where state law conflicts with federal law by either "stand[ing] as an obstacle to the accomplishment of the full purposes and objectives of Congress," *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988) , or rendering it impossible to comply with federal law, *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617-18 (2011). "Federal law preempts state law not only where the two are plainly contradictory but also where

26

'the incompatibility between [them] is discernible only through inference.'" *Hankins v. Finnel*, 964 F.2d 853, 861 (8th Cir. 1992) (quoting *Hayfield N. R.R. Co. v. Chi. & N.W. Transp. Co.*, 467 U.S. 622, 627 (1984)).  The ultimate task for the court is to determine—looking to "the provisions of the whole [federal] law, and to its object and policy"—whether state regulation is consistent with the structure and purpose of the federal statute as a whole.  *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51 (1987).  Field and conflict preemption are not "rigidly distinct;" instead, the criteria for both can overlap.  *Crosby*, 530 U.S. at 372 n.6; U.S. Const. art. VI, cl. 2.

And, as previously explained, in a Spending Power context like this one, the presumption against preemption is inverted because the "obligations to and rights of the United States under its contracts are governed exclusively by federal law." *Boyle*, 487 U.S. at 504.  At bottom, states may not upset the bargained-for consideration of a federal contract and rewrite private parties' contracts with the federal government.  *See id.*  Indeed, even for generally applicable laws (unlike North Dakota's), the threshold for preemption is low in this context and met when "the federal interest requires a uniform rule," such that the "entire body of state law applicable to the area conflicts and is replaced by federal rules." *Id.* at 507-08; *United States v. Kimbell Foods*, 440 U.S. 715, 728 (1979) ("[F]ederal programs that by their nature are and must be uniform in character throughout the Nation necessitate formulation of controlling federal rules."); *Astra*, 563 U.S. at 120 (emphasizing that HHS needed to administer 340B on a "uniform, nationwide basis").

H.B. 1473, under Defendants' interpretation, is both field and conflict preempted.

1. <u>Under Defendants' Interpretation, H.B. 1473 Intrudes On An Exclusively Federal Field</u>

The federal 340B statute provides a comprehensive set of instructions for how HHS must administer the program and enforce its requirements.  The federal statute addresses precisely: (1) which entities can be eligible for 340B prices, 42 U.S.C. § 256b(a)(4); (2) which prescriptions are and are not eligible for 340B prices, *id.* § 256b(a)(5); (3) under which circumstances drug

manufacturers must offer 340B drug pricing, and what conditions those offers may and may not include through the bona fide offer requirement, *id.* § 256b(a)(1); and (4) a highly detailed set of iterative enforcement measures to address issues that arise under the program, *id.* § 256b(d); *see Novartis*, 102 F.4th at 460-64.  At no point in 340B did Congress provide states any authority to implement, much less modify, any of the requirements of the 340B program.  Unlike joint federal-state programs like Medicaid, 340B is not an exercise in cooperative federalism.

The field governed by this federal program is defined by its specific provisions regulating each of its key functions, including eligibility for 340B pricing, the content of a drug manufacturer's 340B offer (it must remain a bona fide offer of the 340B price), and the administration and enforcement of the statute's requirements.  Field preemption applies where a state law "diminish[es] the [federal government]'s control over enforcement and detract[s] from the integrated scheme of regulation created by Congress." *Arizona*, 567 U.S. at 402.  And the field here specifically covers how the federal program addresses contract pharmacies.  *See Novartis*, 102 F.4th 460-64 (explaining in detail how subsection (a)(1) addresses bona fide offers relating to contract pharmacies); 61 Fed. Reg. at 43,550, 43,555 (explaining how contract pharmacy issues are addressed under 340B's diversion restrictions).

The Supreme Court's unanimous 2011 decision in *Astra* demonstrates how Congress intended the 340B program to operate:  As a single nationally uniform program, with a single federal agency decisionmaker (subject to review by federal courts).  563 U.S. at 121-22.  The Supreme Court specifically warned that permitting multiple decisionmakers to address how the 340B program operates could risk "conflicting adjudications" at odds with Congress' intent.  *Id.* at 120.  And that, the Supreme Court explained, is why Congress enacted a detailed remedies provision to supply the "proper remed[ies]" for disputes between drug manufacturers and covered

entities. *Id.* at 120-22. As the federal government has made clear repeatedly, that federal process is the exclusive means to address disputes about contract pharmacies and asserted obligations to supply 340B-priced drugs to them. *See AHA* Gov. Reply Br. at 5; Br. for the United States as Amicus Curiae at *10, *Astra*, No. 09-1273, 2010 WL 4717264 (U.S. Nov. 19, 2010).

Because *Astra* was brought as a case to enforce the federal agreement with drug manufacturers, it involved federal common law claims. But its reasoning applies with full force to state legislation or state common law claims that seek to accomplish the same end—and it compels the conclusion that they are preempted. Tr. at 27:14-21, *Astra*, No. 09-1273 (U.S. Jan. 19, 2011) (Federal government attorney: "[T]his is essentially a pre-emption question, but you then have 50 different State regimes, State court regimes, put onto—grafted onto, the Medicaid rebate requirements. This is supposed to be a uniform pricing scheme. And so once the requirements become dis-uniform, it becomes very difficult for HHS to administer the scheme."); *Morrisey*, 760 F. Supp. 3d at 458 (concluding that the holding in *Astra* "controls" in a similar state law preemption challenge). Indeed, *Astra* analyzed the same factors of Congressional intent (national uniformity, centralized enforcement, risk of inconsistent judgments, detailed federal remedial process) that undergird decisions on preemption. *See* 563 U.S. at 121-22; *Arizona*, 567 U.S. at 406; *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould, Inc.*, 475 U.S. 282, 286 (1986).

If construed to apply to PhRMA members' 340B offers, H.B. 1473 is preempted because it regulates in this exclusively federal field. Indeed, Defendants' attempt to impose the same type of unlimited contract pharmacy mandate that *Novartis* concluded was beyond even HHS's authority. 102 F.4th at 460-64. On Defendants' view, H.B. 1473 prohibits a range of conditions on manufacturers' offers under 42 U.S.C. § 256b(a)(1), including a one contract pharmacy limitation and a claims data condition. H.B. 1473 § 1(b)(1)-(3). Both conditions are explicitly

permitted under federal law in a bona fide offer, but Defendants maintain that H.B. 1473 bans them, compelling manufacturers to sell drugs at 340B prices even when Congress has not. *See id.*

Under Defendants' construction, H.B. 1473 would also introduce a competing enforcement regime addressing the same issues (one contract pharmacy and claims data conditions) as the federal program. Under the federal regime, HHS utilizes a range of tools to secure compliance (informal dispute resolution, audits, corrective action, adjustments, etc.). By contrast, Defendants' interpretation seeks to punish drug manufacturers for obeying federal law—and to haul them into state court to face severe civil and criminal penalties. *Id.* § 1(b). It is impossible to reconcile North Dakota's view of its state-court enforcement process with *Astra*. *See* 563 U.S. at 120-22.

North Dakota cannot sidestep *Astra* and preemption by suggesting that its statute regulates only "delivery" to contract pharmacies, not sales or prices. Under Defendants' interpretation, North Dakota's law compels manufacturers to sell drugs at 340B prices when federal law does not. Indeed, that is the whole point. Congress allows manufacturers to refuse to sell drugs at 340B prices to covered entities that refuse to agree to one contract pharmacy and claims data conditions in a bona fide offer. North Dakota, under Defendants' construction of H.B. 1473, does not. As explained, *supra* at 13-16, a covered entity that refused to accept a manufacturer's conditions would reject the offer, and no 340B purchase would take place. With Defendants' version of H.B. 1473 applied, a manufacturer is compelled to sell the 340B-priced drug to the covered entity, even though the manufacturer's lawful offer under federal law was *not accepted*. *See* H.B. 1473 § 1(b). H.B. 1473 would thus have nothing to do with delivery and everything to do with sale and price.

Moreover, even if H.B. 1473 were viewed as in part about "delivery," that does not help North Dakota: *Novartis* explained in detail how 340B addresses delivery to contract pharmacies under subsection (a)(1) of the federal statute, and through the subsection (a)(5) ban on diversion.

102 F.4th at 460-64.  And *Novartis* and *Sanofi* both indicate that the federal government does have authority over delivery to contract pharmacies in specified circumstances, namely (1) to ensure an offer remains bona fide, it could potentially require delivery of 340B-priced drugs to one contract pharmacy, and (2) it could prohibit certain delivery conditions that alter the federally mandated 340B price (e.g., mandating delivery be accepted in another country).  *Supra* at 14-16.  Moreover, disputes over obligations to deliver to multiple contract pharmacies have been adjudicated under 340B's ADR procedures.  *Supra* at 18.  Thus, there is no genuine way to separate the subject matter of H.B. 1473 and 340B.  Under Defendants' view, H.B. 1473 adds new and explicit restrictions to 340B's core obligations and impermissibly operates in the heart of the field 340B occupies.

    2.   Under Defendants' Interpretation, H.B. 1473 Conflicts With The Federal Regime

Under Defendants' interpretation, H.B. 1473 is also preempted under ordinary conflict preemption principles.  Where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby*, 530 U.S. at 373, or "interferes with the methods by which the federal statute was designed to" achieve those purposes and objectives, it is conflict preempted, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).  A state law is also conflict preempted where it interferes with a private party's rights conferred by federal law.  *Murphy v. NCAA*, 584 U.S. 453, 477-78 (2018).

    *a.   H.B. 1473 Would Conflict With Congress's Offer-and-Acceptance Mechanism And Impermissibly Expand The Scope Of The Federal 340B Subsidy*

H.B. 1473, as construed by Defendants, conflicts with 340B's offer-and-acceptance mechanism and expands the federal subsidy by requiring additional 340B-priced transactions.  It thus directly "interferes with the methods by which the federal statute was designed to" achieve its purposes, *Int'l Paper*, 479 U.S. at 494, and reworks manufacturers' 340B obligations.

As discussed, *Novartis* establishes that the bargain offered by Congress—and accepted by

manufacturers participating in 340B—allows manufacturers the flexibility to set certain reasonable terms of their 340B "offers" (*e.g.*, delivery terms and other reasonable conditions of purchase) other than the price, and that manufacturers discharge their 340B obligations so long as their "offers" to sell at the 340B price remain bona fide in light of the other terms. *Novartis*, 102 F.4th at 460-62. Manufacturers are explicitly permitted and therefore have the right to include these reasonable conditions in their 340B bona fide offers. *Id.* at 459-64; *Murphy*, 584 U.S. at 477-78.

Under 340B, manufacturers can (and do) specify reasonable conditions on their 340B offers, including those related to providing 340B-priced drugs to a single contract pharmacy and requiring claims data. Ex. 1 ¶¶ 14-19; Ex. 2 ¶¶ 15, 22-26; Ex. 3 ¶¶ 12-14. These conditions are incorporated into the ordering platform used by drug distributors. Ex. 2 ¶¶ 21-23; Ex. 3 ¶¶ 14. If covered entities and contract pharmacies ordering on the platform do not accept the conditions, they cannot purchase 340B-priced drugs. Ex. 1 ¶¶ 13-14; Ex. 2 ¶¶ 25-28; Ex. 3 ¶¶ 13-14. By outlawing these conditions and applying H.B. 1473 to drugs not actually purchased under 340B, Defendants' interpretation of H.B. 1473 vastly expands the number of 340B transactions and destroys the offer-acceptance construct Congress mandated. *Astra*, 563 U.S. at 120; *Int'l Paper*, 479 U.S. at 494. Without H.B. 1473, there would be no sale at the 340B price in circumstances that violate a contract pharmacy or claims data condition. With H.B. 1473, however, a purchase at the 340B price would occur: H.B. 1473 bars manufacturers from imposing a federally lawful condition, and, as a result, covered entities can accept the resulting offer without that condition.

Requiring manufacturers to provide 340B-priced drugs in circumstances where federal law does not poses multiple direct conflicts with federal law under Supreme Court precedent. To start, it "interfere[s] with the methods by which the federal statute was designed to" achieve its purposes. *Int'l Paper*, 479 U.S. at 494. Congress chose to implement 340B through an offer-and-acceptance

methodology that allows manufacturers to discharge their 340B obligation by making offers that include conditions regarding contract pharmacy use.  Disputes about the sufficiency of a federal offer are to be addressed by HHS and federal courts interpreting federal law.  42 U.S.C. § 256b(d)(3); 89 Fed. Reg. 28,643, 28,657 (Apr. 19, 2024).  On Defendants' view, H.B. 1473 nonetheless compels manufacturers to provide 340B-priced drugs to contract pharmacies by dictating the contours of their offers, overruling the determinations of HHS and federal courts about what is permissible in a 340B offer.  But states cannot overrule the mechanisms Congress put in place to implement its federal program.  *Crosby*, 530 U.S. at 373 (a state may not adopt another "mechanism" to implement or enforce federal law); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103-05 (1992) (non-conflicting state laws promoting worker safety were preempted by federal safety statute because they interfered with Congress's chosen method); *Gould*, 475 U.S. at 286-87 (state law preempted where it conflicted with Congress's chosen technique); *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (state statute conflict preempted where it prohibited banks from selling insurance that Congress permitted).

And by compelling transactions at the 340B price that would not otherwise occur under federal law, Defendants' interpretation of H.B. 1473 expands the scope of manufacturers' 340B obligations and fundamentally alters the bargain struck by Congress with manufacturers for participation in 340B, Medicare, and Medicaid.  That makes participation in 340B, Medicare, and Medicaid significantly more burdensome, fundamentally altering the delicate balance struck by Congress to facilitate manufacturer participation.  That, too, renders H.B. 1473 preempted.  *See Int'l Paper*, 479 U.S. at 494 (state law preempted where it "upset[] the balance of public and private interests so carefully addressed by the [federal statute]"); *Forest Park II v. Hadley*, 336 F.3d 724, 730, 732-33 (8th Cir. 2003) (holding, where Congress enacts a program that relies on participation

by private parties via incentives and sets those parties' obligations, additional state obligations conflict). Because Defendants' interpretation of H.B. 1473 compels manufacturers to provide 340B-priced drugs in circumstances where federal law does not, it is preempted.

### b. *H.B. 1473 Would Unlawfully Limit Access To Claims Data*

H.B. 1473's limitations on manufacturers' gathering of information are also preempted. Under Defendants' interpretation, H.B. 1473 restricts the collection of any "claims, encounter, or utilization data." H.B. 1473 § 1(b)(3). But manufacturers are permitted under federal law to impose these conditions on their offers. *Supra* at 15. Prohibiting manufacturers from obtaining data on the transactions to which the federal price allegedly applies stands as a direct obstacle to the federal system's enforcement scheme, which is predicated on manufacturers' ability to obtain claims data and other evidence that helps manufacturers identify potential violations and access the federal enforcement regime. *See Morrisey*, 760 F. Supp. 3d at 450-53 (holding similar state law that barred collection of claims data preempted because it conflicted with manufacturers' 340B audit rights and federal enforcement regime); *Eli Lilly & Co. v. Kennedy*, No. 24-cv-3220, 2025 WL 1423630, at *13 (D.D.C. May 15, 2025) (affirming manufacturers' right to "impose data-reporting conditions on covered entities" and explaining why claims data is important to program integrity). Worse, it would curtail manufacturers' ability to utilize what is known as a rebate model to provide the 340B price, a mechanism explicitly contemplated under the federal statute, and that relies on claims data. 90 Fed. Reg. at 36,163; 42 U.S.C. § 256b(a)(1); *infra* at 36-37.

Under the federal regime, a manufacturer must first audit a covered entity before initiating ADR. *See* 42 U.S.C. §§ 256b(a)(5)(C), (d)(3)(B)(iv). Audits, in turn, are conducted "in accordance with procedures established by the Secretary relating to the number, duration, and scope." *Id.* § 256b(a)(5)(C). HHS has specified manufacturers are only permitted to conduct an audit where they can "demonstrate … that there is 'reasonable cause,' supported by 'sufficient

facts and evidence.'" *Eli Lilly*, 2025 WL 1423630, at *2 (quoting 61 Fed. Reg. 65,406, 65,409-10 (Dec. 12, 1996)). So, manufacturers only may conduct an audit where they "ha[ve] documentation which indicates there is reasonable cause." 61 Fed. Reg. at 65,409; *Novartis Pharm. Corp. v. Espinosa*, No. 21-cv-1479, 2021 WL 5161783, at *8 (D.D.C. Nov. 5, 2021) (explaining manufacturer "convincingly argues that the claims data conditions … will enable it to better utilize the anti-fraud audit and ADR procedures that Congress established for manufacturers").[8]

Claims data is this very "documentation" that is essential to access the federal audit process. To audit for "duplicate discounts," a manufacturer must have sufficient information regarding what prescriptions are at issue (including what facility wrote the prescriptions and what physician)—to demonstrate with documentation that there is duplication. 61 Fed. Reg. at 65,409-10; *Eli Lilly*, 2025 WL 1423630, at *13. The same is true for "diversion"—a manufacturer must know what prescriptions the covered entity believes qualify for the 340B price and how those prescriptions were dispensed. Manufacturers' policies to collect such data are in line with widespread "business practices" and collect "standard information" used throughout the industry. *Novartis*, 102 F.4th at 463; *see also Morrisey*, 760 F. Supp. 3d at 451 (noting the collection of such data is a "widespread industry practice"); 340B ESP Claims Data Fields, Ex. 32.

Yet under Defendants' interpretation, H.B. 1473's claims data prohibition directly interferes with that process by letting covered entities and contract pharmacies shield this information, limiting manufacturers' access to evidence of federal violations and handicapping manufacturers' use of the exclusive federal resolution process Congress provided for them. *See Eli Lilly*, 2025 WL 1423630, at *13. This creates a direct conflict with the federal regime.

---

[8] *See also* Ex. 17 at 230 (to dispute any IRA duplicate inflation rebate with CMS, manufacturers must "provide documentation [to CMS] demonstrating the claim was 340B-eligible").

*Morrisey*, 760 F. Supp. 3d at 450-53 (concluding similar claims data restriction was likely preempted because it "hampers the ability of drug manufacturers to formulate the 'reasonable cause' necessary to conduct an audit in the first place"). "By restricting the very method by which data collection is made, [the state statute] frustrates drug manufacturers' ability to take the initial steps necessary to start the very audit required to access" ADR and thus "stands as an obstacle to achieving the federal objective of preventing fraud in" 340B. *Id*.

The inability to access claims data is not just a problem under 340B. Under the new IRA Medicare Drug Price Negotiation Program, HHS is to "negotiate" with manufacturers the "maximum fair price[s]" for certain drugs. 42 U.S.C. § 1320f-3(a). Manufacturers must provide access to selected drugs at the so-called maximum fair prices, except when such selected drugs are 340B-eligible and the 340B price is lower. *Id.* § 1320f-2(d). To avoid duplicating price reductions, this scheme requires identifying when a specific drug is acquired at the 340B price, a burden CMS places on manufacturers. *See* Ex. 17 at 57-58, 60. Manufacturers thus require claims data to avoid providing duplicative price reductions, including by implementing what is known as a "rebate model" as part of HHS's Rebate Model Pilot Program. *Infra* at 37-39. But H.B. 1473 now purports to prohibit manufacturers from obtaining this very data. That is another irreconcilable conflict.

Defendants' attempt to prohibit conditions requiring industry-standard claims data needed to prevent 340B abuses and utilize the federal enforcement regime stands in stark contrast to other states' express disclaiming of any attempt to restrict manufacturers' claims data policies.[9]

### c.   *H.B. 1473 Would Impermissibly Seek To Outlaw The Rebate Model*

Under Defendants' interpretation, H.B. 1473 also conflicts with 340B by outlawing the use of the rebate model to provide the 340B price, despite rebates being explicitly permitted under

---

[9] Miss. Br. 31-32, *PhRMA v. Fitch*, No. 24-60340 (5th Cir.), ECF No. 40; Md. Br. 29, *PhRMA v. Brown*, No. 1:24-cv-01631 (D. Md.), ECF No. 19-1; Hawaii H.B. 712 Sec. 2, § 2(b).

federal statute and under a recent federal Rebate Model Pilot Program, implemented by HHS under 340B. *See* 42 U.S.C. § 256b(a)(1) ("taking into account any rebate or discount"); *see* 63 Fed. Reg. 35,239, 35,240 (June 29, 1998) (rebate option is "consistent with the section 340B rebate program"); *Eli Lilly*, 2025 WL 1423630, at *9 n.11 (stating 340B statute "explicitly contemplates a rebate mechanism" and holding rebate models are allowed); 90 Fed. Reg. at 36,163-65.

To help facilitate compliance with the IRA and 340B, certain manufacturers have sought to use what is called the "rebate model," under which they would collect claims data and then provide the 340B price through rebates—rather than as upfront discounts—to assist in preventing duplicate discounts. *See* 90 Fed. Reg. at 36,163-65. In August, HHS announced that it is establishing a Rebate Model Pilot Program for certain manufacturers (including some of PhRMA's members) to offer the 340B price via rebates. *Id.* In addition to expressly recognizing the use of rebates, the announcement also makes clear that participating manufacturers can demand certain claims data as part of their rebate models. *Id.* at 36,164. This data includes information like the date of service, date of prescribing, national drug code, prescriber and service provider ID, and 340B ID, among other things. *Id.* at 36,165. As HHS explained, the collection of this data is aimed at preventing duplicate discounts between 340B and the IRA. *Id.* at 36,163-64.

Notwithstanding that, Defendants purport to outlaw manufacturers from providing the 340B price as a "rebate," rather than "in the form of a discount," as well as manufacturers' ability to request claims data. H.B. 1473, § 1(b)(5). That restriction bars manufacturers from utilizing the very rebate models contemplated by 340B and HHS. That sets up yet another direct conflict.

### d.  H.B. 1473 Would Conflict With The Federal Enforcement Regime

Under Defendants' construction, H.B. 1473 also conflicts with the exclusive federal administrative and enforcement regime. *Astra*, 563 U.S. at 113; *Buckman*, 531 U.S. at 349-50 (where agency had "a variety of enforcement options that allow it to make a measured response,"

greenlighting state-law tort claims would "inevitably conflict with the [agency's] responsibility to police fraud consistently with [its] judgment and objectives"); *Morrisey*, 760 F. Supp. 3d at 457 ("If private attempts to enforce the 340B Program go against 'what Congress contemplated when it centralized enforcement in the [federal] government,' then so too would public attempts to enforce it."); 42 U.S.C. §§ 256b(d)(1)(B)(i)(IV), (ii) (iterative process between manufacturers and HHS); Pharmaceutical Pricing Agreement at IV(c) (reflecting that process), Ex. 33.

Like the claims in *Astra*, Defendants' construction of H.B. 1473 conflicts with the federal enforcement regime by usurping HHS's unitary enforcement authority. *Morrisey*, 760 F. Supp. 3d at 457. Federal regulations make clear HHS's view that it has authority to address the issues H.B. 1473 targets. *See* 42 C.F.R. § 10.21(a)(1); 89 Fed. Reg. at 28,649 (defining overcharge claim in ADR to be "a claim that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price or the manufacturer does not offer the 340B ceiling price"); *St. Croix* Summary, Ex. 19. And the federal government has explained "*Astra* left no doubt that 'Congress directed [HHS] to create [ADR]' in order 'to make [ADR] the proper remedy for covered entities' complaining of 340B violations," specifically "dispute[s] over contract-pharmacy restrictions." *AHA* Gov. Reply Br. at 5. Yet Defendants seek to address the same disputes, contra to *Astra*. *Morrisey*, 760 F. Supp. 3d at 453-59.

A preview of potential state enforcement proceedings underscores the conflict. In any state proceeding, a manufacturer will assert federal defenses, including that the specific prescriptions subject to enforcement are not qualified under federal law for a 340B price. This is an essential threshold issue North Dakota cannot avoid, and requires deciding multiple federal law questions, including whether: (1) the prescriptions are written for qualifying 340B patients, under the federal definition of "340B patient," *Eli Lilly*, 2025 WL 1423630, at *2; (2) the prescriptions illegally

duplicate Medicaid rebates, 42 U.S.C. § 256b(a)(5)(A); (3) the contract pharmacy that dispenses the 340B-priced drugs could lawfully receive it, *id.* § 256b(a)(5)(B); and/or (4) these violations under federal law disqualify the covered entity from participation in 340B, *Astra*, 563 U.S. at 120.

Permitting state intervention in these issues would allow 50 states to subvert and destroy the federal government's unified control over 340B. *Arizona*, 567 U.S. at 406; *Gould*, 475 U.S. at 286. That is precisely what the *Morrisey* court (the first court to seriously contend with *Astra* in this context) concluded, recognizing *Astra* controlled. 760 F. Supp. 3d at 458. The Supremacy Clause does not permit North Dakota to adopt a scheme that eviscerates the uniformity Congress intended. *Buckman*, 531 U.S. at 350. With many states enforcing their own visions of 340B, the uniformity central to 340B's administration would be shattered. *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 639 (1973) (recognizing danger of "fractionalized control").

### C. *McClain* Does Not Control

Defendants may attempt to rely on *Pharmaceutical Research & Manufacturers of America v. McClain*, 95 F.4th 1136 (8th Cir. 2024), but that reliance would be misplaced here. *McClain* did not address Congress's offer-and-acceptance framework as identified in *Novartis,* or *Novartis*'s holding that one contract pharmacy and claims data conditions are lawful and instead addressed other arguments, including that law's facilitation of diversion of 340B-priced drugs by permitting contract pharmacies (rather than covered entities) to acquire them. *Id.* at 1143-45. To the extent *McClain* had anything to say that bears on PhRMA's current argument that H.B. 1473 compels additional sales to occur at the 340B price, *McClain* supports PhRMA.

There is a good reason *McClain* did not address any conflict with the federal offer-and-acceptance framework: It was decided *before Novartis*. The later-in-time *Novartis* decision definitively construed and clarified manufacturers' obligations to "offer" 340B priced drugs under the federal statute and overturned the pre-*Novartis* federal regulatory regime under which *McClain*

was decided.  Before *Novartis*, HHS had adopted essentially the same position as H.B. 1473 as to

contract pharmacy delivery:  That 340B imposes a "delivery" obligation to provide drugs to "an

unlimited number of contract pharmacies."  *Novartis*, 102 F.4th at 459.  So there was no occasion

for *McClain* to consider any specific "conflict" with the federal offer-and-acceptance regime, and

no such argument was raised or ruled upon in that case.[10]  *See Gonzalez-Vega v. Lynch*, 839 F.3d

738, 740-41 (8th Cir. 2016) (holding that prior decision was not binding as to specific argument

regarding effect of new case where prior decision had not addressed the new case's effect).

After *McClain* was decided, *Novartis* subsequently held that HHS's administrative

construction violated the 340B statute.  102 F.4th at 460-64.  *Novartis* explained that the proper

inquiry focuses on 340B's explicit instructions regarding the scope of the federal obligation.

Specifically, a manufacturer must only "offer" a drug at the 340B price, which "merely requires

manufacturers to *propose* to sell covered drugs to covered entities at or below a specified monetary

amount."  As *Novartis* clarified, that is the proper lens for evaluating manufacturer conditions,

including contract pharmacy restrictions.  *Id.* at 460-61.  So the statute's "silence" did not leave a

gap for HHS—much less the 50 states—to fill by *imposing* other obligations:  Rather, "this silence

preserves … the ability of sellers to impose *at least some delivery conditions*" so long as the offer

to sell at the 340B price remains bona fide.  *Id.* at 460 (emphasis added).  That includes conditions

on the number of contract pharmacies to which drugs are provided.  *Id.* at 463-64.

The upshot is that prior to *Novartis*, it was not completely clear that state laws compelling

unlimited delivery to contract pharmacies resulted in more 340B transactions than would otherwise

---

[10] An opinion should not be construed to resolve issues not "raised by the parties nor discussed by the panel."  *Streu v. Dormire*, 557 F.3d 960, 964-65 (8th Cir. 2009); *United States v. Bruguier*, 735 F.3d 754, 762-63 (8th Cir. 2013) (similar); *Waters v. Churchill*, 511 U.S. 661, 678 (1994) ("[C]ases cannot be read as foreclosing an argument they never dealt with.").

occur under federal law.  *See McClain*, 95 F.4th at 1145 (finding that Arkansas law "assists" with the "purpose" of 340B).  By contrast, *McClain* itself accepted that a state law *would be* preempted if it attempted to "set or enforce discount pricing" where federal law did not do so.  *Id.*

That is exactly what Defendants' construction of H.B. 1473 does:  After *Novartis*, there is no question that federal law allows a manufacturer to include conditions on the number of contract pharmacies the manufacturer will provide 340B-priced drugs to, contrary to HHS's historical-but-since-ruled-unlawful guidance.  *Novartis*, 102 F.4th at 459.  Now that federal law clearly *does not* require sales of 340B-priced drugs when a purchaser *rejects* the manufacturer's reasonable offered contract pharmacy conditions, the consequence is that H.B. 1473 compels transactions at the 340B price that the federal 340B statute *does* not compel at the 340B price.  Indeed, Defendants' refusal to apply H.B. 1473's plain text, which would only apply H.B. 1473's substantive limitations to drugs *already purchased* through 340B, makes this point crystal clear.  If Defendants were not using H.B. 1473 to compel additional 340B-priced sales, there would be no reason to object to applying H.B. 1473's plain text to limit its application to drugs already purchased under 340B.

*McClain* also did not concern or resolve several other arguments PhRMA advances here. As to PhRMA's arguments regarding claims data restrictions and rebate models, *McClain* did not address such restrictions or the use of rebate models.  And, as to PhRMA's enforcement arguments, *McClain* did not substantively address *Astra* at all, despite *Astra* making clear that administration and enforcement of 340B is solely committed to the federal government, superintended by federal courts.  *Astra*, 563 U.S. at 119-20.  Finally, *McClain* applied the presumption against preemption, 95 F.4th at 1140, which is not applicable here for the reasons discussed, *see supra* at 5.

## III.    UNDER DEFENDANTS' INTERPRETATION OF H.B. 1473, H.B. 1473 VIOLATES THE CONSTITUTION'S BAR ON EXTRATERRITORIAL REGULATION

Defendants' construction would lead to a second infirmity:  direct regulation of out-of-state

transactions that violates the U.S. Constitution's prohibition on extraterritorial regulation.

Since ratification of our Nation's Constitution, the states have been governed by a fundamental principle: no state can regulate conduct outside its boundaries in the territory of its sister states. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). This principle flows both from the Constitution's Commerce Clause, which gives our federal government responsibility for regulating commerce among the states, and from several other Constitutional provisions defining the role of states within our Republic. U.S. Const. art. I, § 8, cl. 3; *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374, 376 n.1 (2023); *Accessible Meds.*, 140 F.4th 957, 959. Recognizing the issues inherent in regulating conduct across state lines, the Framers designated Congress as the sole authority for governing commerce between states. The U.S. Constitution provides that "Congress shall have [the] Power … [t]o regulate Commerce … among the several States." U.S. Const. art. I, § 8, cl. 3. This affirmative grant of power includes a "negative command, known as the dormant Commerce Clause," which prohibits states from legislating in ways that hinder interstate commerce and disrupt unified national markets. *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

Among the ways that a state can violate this prohibition is by enacting a law with "the practical effect of extraterritorial control on interstate commerce." *Accessible Meds.*, 140 F.4th at 960 (quoting *Styczinski v. Arnold*, 46 F.4th 907, 912 (8th Cir. 2022)). This principle is not unlimited, as the Supreme Court recently emphasized in *Pork Producers*. There is no "per se rule" against such laws, so a state may prohibit the sale of a product *within its borders* even if those restrictions affect commerce beyond the state's borders. *Pork Producers*, 598 U.S. at 371 (rejecting challenge to California law banning "in-state sale" or pork raised using certain practices, even though that law would affect practices of out-of-state farms). But as the Eighth Circuit has

since recognized, *Pork Producers* did not effect a sea change in extraterritoriality jurisprudence. Just the opposite: *Pork Producers* "'sa[id] nothing new' about the extraterritoriality doctrine." *Accessible Meds.*, 140 F.4th at 961 (quoting *Pork Producers*, 598 U.S. at 374). Thus, a state still "has no power to project its legislation into another state by regulating the price to be paid *in that state*." *Id.* at 960 (emphasis added) (quoting *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S.644, 669 (2003)). Nor, more broadly, may a state "*directly* regulat[e] transactions which take place wholly outside the State"—a prohibition that *Pork Producers* expressly preserved. *Id.* at 961.

The Eighth Circuit's *Accessible Medicines* decision all but resolves this claim by holding that a state cannot regulate transactions between drug manufacturers and distributors occurring out of state, even if the drugs at issue are eventually sold in the regulating state. That case involved a Minnesota law prohibiting manufacturers from "impos[ing], or caus[ing] to be imposed, an excessive price increase … on the sale of any generic or off-patent drug sold, dispensed, or delivered to any consumer in the state." *Id.* at 959 (quoting Minn. Stat. § 62J.842 subd. 1). Minnesota sought to defend its statute by arguing that it applied only to drugs ultimately sold to consumers in Minnesota. *Id.* at 960. But that was not enough to avoid the Commerce Clause problem. What mattered was where the conduct that the statute prohibited occurred. Because the statute prohibited a manufacturer's sale at an "excessive" price, the relevant location was the location of the manufacturer's sale. *Id.* at 959-60. Because "a Colorado manufacturer would be penalized if it sold drugs to a New Jersey distributor at prices above those proscribed by the Act," the law violated the dormant Commerce Clause for two separate reasons: It had "the specific impermissible extraterritorial effect of controlling prices outside of Minnesota" and it "*directly* regulate[d] transactions which t[ook] place wholly outside the State." *Id.* at 959, 961. That the drugs later "ended up in Minnesota" was irrelevant. *See id.* at 959-60.

Defendants' construction of H.B. 1473 violates the Constitution's prohibition on extraterritorial regulation for the same reason as in *Accessible Medicines*. As there, PhRMA's members and the main distributors to which they sell are all located outside of North Dakota. Pharmacies and healthcare providers then purchase PhRMA's members' drugs from these out-of-state distributors. Manufacturers sell these drugs at commercial prices that exceed the 340B price and—so that distributors do not incur losses when they sell drugs at lower 340B prices—compensate distributors for 340B-priced sales that adhere to manufacturer contract pharmacy policies. Ex. 1 ¶ 10; Ex. 2 ¶¶ 10, 16, 20-27. To the extent that manufacturers violate any of H.B. 1473's prohibitions, it is because they do not compensate distributors for sales at 340B prices that are inconsistent with their contract pharmacy policies—that is, sales to unauthorized contract pharmacies or contract pharmacies of covered entities that do not agree to provide claims data. *See* H.B. 1473, §§ 1(b)(1), (3), (5). By requiring manufacturers to change these pricing practices to comply, H.B. 1473 would have "the specific impermissible extraterritorial effect of controlling prices outside of [North Dakota]." *Accessible Meds.*, 140 F.4th at 960. Pricing aside, the fundamental problem is that, under Defendants' construction, H.B. 1473 would "*directly* regulate[] transactions which take place wholly outside [North Dakota]." *Id.* at 961.[11] As *Accessible Medicines* holds, North Dakota cannot dictate to manufacturers how they conduct business with distributors outside the state. Yet, on Defendants' reading, that is exactly what H.B. 1473 does.

---

[11] As *Pork Producers* explains, 598 U.S. at 376 n.1, this principle traces to *Edgar v. MITE Corp.*, which invalidated an Illinois requirement to register corporate takeover offers with the Illinois Secretary of State when the target company had specified ties to Illinois, such as being organized under Illinois law. 457 U.S. 624, 626-27, 641 (1982). The law had nothing to do with pricing; the problem was that it "directly regulate[d] transactions which t[ook] place across state lines, even if wholly outside the state of Illinois." *Id.* at 641. The law struck down in *Styczinski* was not a price regulation, either. That law required bullion dealers to register, obtain a surety bond, and refrain from "certain sales practices" when dealing with a Minnesota resident. *See* 46 F.4th at 910-11.

If anything, the case for H.B. 1473 violating the Constitution is stronger here.  The law in *Accessible Medicines* required a drug at some point to be "sold, dispensed, or delivered … in the State." *Id.* at 959 (quoting Minn. Stat. § 62J.842 subd. 1).  H.B. 1473 contains no geographic limitations at all.  *See* H.B. 1473, § 1(a)(2) (incorporating federal definition of "covered entity" which applies to covered entities nationwide).  Even if H.B. 1473 were limited to drugs ultimately purchased by North Dakota covered entities, extraterritoriality problems would remain.  According to federal statistics, almost half of contract pharmacies for North Dakota-based covered entities are outside North Dakota, many located far from North Dakota in states including California, New Jersey, and Alabama, among others.  *Supra* at 19.  These contract pharmacy relationships strongly suggest that these North Dakota covered entities and their contract pharmacies may be violating federal law by distributing 340B-priced drugs to people who are not patients of the relevant covered entity.  *See* 42 U.S.C. § 256b(a)(5)(B) (prohibiting "res[ale]" or "transfer" of 340B-priced drugs "to a person who is not a patient of the [covered] entity").  But even if these contract pharmacies are providing drugs to North Dakota patients of North Dakota entities, North Dakota has no power to regulate these far-flung transactions.  *See Styczinski*, 46 F.4th at 913-14 (holding Minnesota lacked power to regulate transaction with Minnesota resident in Nevada).

In *Accessible Medicines*, the Minnesota law violated the Constitution because it regulated sales by a Colorado manufacturer to a New Jersey distributor *if* "those drugs ended up in Minnesota." 140 F.4th at 960.  But under H.B. 1473, the drugs need not even "end[] up" in North Dakota.  By its plain terms, the law prohibits manufacturers from interfering with delivery of drugs to contract pharmacies in any state, regardless of where the medications end up.  The law thus directly regulates extraterritorial conduct under *Accessible Medicines,* multiple times over.

## CONCLUSION

PhRMA respectfully requests that the Court enter summary judgment in its favor.

Dated:  October 15, 2025

Respectfully submitted,

_/s/ Ryan C. McCamy_____

Ryan C. McCamy, ND ID #06420
Conmy Feste Ltd.
3369 45th Street South
Fargo, ND 58104
Telephone: (701) 293-9911
rmccamy@conmylaw.com

And:

Philip J. Perry*
Andrew D. Prins*
Abid. R. Qureshi*
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
philip.perry@lw.com
andrew.prins@lw.com
abid.qureshi@lw.com

*Admitted pro hac vice*

*Counsel for Plaintiff Pharmaceutical Research and Manufacturers of America*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

<u>s/ Ryan C. McCamy</u>
Ryan C. McCamy
